

FILED

AUG 1 5 2006

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ Deputy Clerk

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

ENTERED

AUG 1 6 2006

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ Deputy Clerk

In re

Substantively Consolidated
Bankruptcy Estates of MIDLAND
EURO EXCHANGE INC.; MIDLAND EURO,
INC.; MIDLAND GROUP INC.; MOSHE
LEICHNER AND ZVI LEICHNER

          Debtors

CHRISTOPHER R. BARCLAY , as
trustee of the herein
Substantively Consolidated
Bankruptcy Estates of Midland
Euro Exchange, Inc., Midland
Euro, Inc., Midland Group, Inc.,
Moshe Leichner, and Zvi Leichner,

          Plaintiff,

vs.

SWISS FINANCE CORPORATION
LIMITED, aka SWISS FINANCE
CORPORATION, a foreign company;
and DOES 1-10, Inclusive,

          Defendants

Case No. SV 03-13981-GM
[Includes cases previously
designated as Bk. Case Nos. SV
03-13982-AG, SV 03-13986-AG, SV
03-13987-AG, SV 03-13989-AG]

Adv. No. AD 05-01381-GM

Chapter 7

**MEMORANDUM OF OPINION RE
MOTION TO DISMISS PURSUANT TO
F.R.C.P. 12(b)(6)**

HEARING
DATE:    JULY 19, 2006
TIME:    1:30 p.m.
PLACE:  COURTROOM 303
        21041 BURBANK BLVD.
        WOODLAND HILLS, CA 91367

1

## I. INTRODUCTION

2    This action is one of many proceedings stemming from a massive
3  Ponzi scheme run in Southern California between 1999 and 2003.  The
4  complaint alleges that beginning in 1999, Midland Euro, Inc. (MEI),
5  Midland Euro Exchange, Inc. (MEEI), Midland Group, Inc. (MGI), and
6  other related entities (collectively "the Debtor" or "Midland
7  Entities") were used by their founders, owners, and principals -
8  Moshe and Zvi Leichner ("the Leichners") - to collect money from
9  investors all over the world with a promise of extraordinary returns
10  from trades in the foreign exchange market.  Instead, later proceeds
11  were diverted to repay earlier investors.

12    The scheme unraveled in 2003.  Moshe and Zvi Leichner each
13  pleaded guilty to felony fraud and money-laundering charges and were
14  sentenced to twenty years and eleven years in federal prison,
15  respectively, and a restitution judgment of $98 million.[1]  On May 8,
16  2003, involuntary Chapter 7 bankruptcy petitions were filed against
17  the Leichners and the Midland Entities.  By the bankruptcy court's
18  order entered on May 16, 2003, the Debtors' Estates were
19  substantively consolidated.  Thereafter, on June 18, 2003, a Chapter
20  7 Trustee was appointed by the Court.  As of today, proofs of claim
21  totaling more than $100 million have been filed against the Estate,
22  including millions of dollars owed to investors.

23    This adversary proceeding is an attempt by the Trustee to set
24  aside and recover allegedly fraudulent transfers of at least $897,000
25  paid by the Debtor in fees and commissions to a foreign exchange
26  brokerage - Swiss Financial Corporation, Ltd. (SFC).

27

28    [1] <u>United States v. Moshe Leichner and Zvi Leichner</u>, U.S.D.C. No. CR
03-568, U.S. District Court for the Central District of California.

1

## II. PROCEDURAL HISTORY

2    On June 16, 2005, the Trustee filed a complaint against SFC
3    pleading two claims for relief under 11 U.S.C. §548(a)(1)(A) and 11
4    U.S.C. §550(a) and seeking to recover fraudulent transfers of at
5    least $897,000.  Thereafter, on June 12, 2006, SFC filed a motion to
6    dismiss the complaint for failure to state a claim for relief.  The
7    motion was made pursuant to Rule 12(b)(6) of the Federal Rules of
8    Civil Procedure, as made applicable by Rule 7012(b) of the Federal
9    Rules of Bankruptcy Procedure.  The motion also argued that Congress
10   did not intend 11 U.S.C. §548[2] to apply extraterritorially and that
11   the Court should abstain from exercising jurisdiction over this
12   action on the grounds of international comity.

13   The Trustee filed his opposition to the motion to dismiss on July
14   5, 2006, asserting that sufficient facts have been pleaded to
15   overcome the motion to dismiss.  With respect to 11 U.S.C. §548, the
16   Trustee argued that Congress intended to extend its reach
17   extraterritorially, that at least one circuit court reached the same
18   conclusion, and that holding otherwise would create a loophole in the
19   Bankruptcy Code by creating the means for unscrupulous debtors to
20   conceal their assets abroad and therefore outside the reach of the
21   U.S. bankruptcy system.  In addition, the Trustee asserted that the
22   facts pleaded in the complaint fall within the exception to the
23   presumption against extraterritoriality and that the international
24   comity doctrine should not prevent this Court from exercising its
25   jurisdiction.

26   On July 12, 2006, SFC filed its reply to the Trustee's

27

28      [2] Unless otherwise specified, all references to statutes are to 11
United States Code.

3

1 | opposition.   A hearing was held on July 19, 2006.   Based on the
2 | motions filed with the Court and the information provided at the
3 | hearing, and for the reasons that follow, I am granting the motion to
4 | dismiss without leave to amend.   This memorandum constitutes my
5 | findings of fact and conclusions of law with regard to the legal
6 | sufficiency of the Trustee's complaint.

## III. STANDARD OF REVIEW

In addressing a motion to dismiss pursuant to F.R.C.P. 12(b)(6), as made applicable by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, this Court is limited to reviewing the facts pleaded in the complaint.   A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).   For the purposes of this motion, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. See, e.g., Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).

## IV. STATEMENT OF FACTS

### A. The Trustee's Complaint

For the purposes of this motion, the facts pleaded in the Trustee's complaint are uncontroverted.   The complaint alleges that MGI was a Barbados corporation set up by the Leichners in December 2000 to hold title to proceeds of the Ponzi scheme. (Complaint ¶15).   To create an aura of legitimacy and to be able to market itself as a successful currency trader, MGI contacted SFC in or about May 2002,

4

1 requesting to open a foreign exchange trading account. (¶23). At the
2 time, SFC was a foreign exchange brokerage formed under the laws of
3 England and headquartered in London. (¶5).

4     SFC conducted an investigation of the Debtor in order to
5 ascertain its true financial condition prior to opening a margin
6 trading account (permitting the Debtor to trade on credit). (¶24).
7 As part of the investigation, SFC communicated with the Leichners in
8 Los Angeles County, California and learned that the Leichners were
9 the principals of MGI. (¶¶23 - 24).

10     Upon discovering that the Leichners were the principals of MGI,
11 SFC knew or consciously avoided knowledge of "serious and substantial
12 legal and financial problems" involving the Leichners and companies
13 they controlled. (¶¶25 - 26). Specifically, SFC learned the following
14 facts:

15     1. Moshe Leichner was insolvent beginning no later than 1998 and
16         there were unsatisfied judgments of at least $100,000
17         against him. (¶8).

18     2. Moshe Leichner filed a bankruptcy petition in the U.S.
19         Bankruptcy Court for the Central District of California on
20         or about June 22, 1998, which was dismissed without a
21         discharge. (¶9).

22     3. In March 2000, the California Department of Corporations
23         issued a cease and desist order against Zvi Leichner and
24         Midland Euro Exchange Trust (MEET). (¶14).

25     4. There was a judgment in the amount of $800,000 against Zvi
26         Leichner in litigation entitled <u>Rawashdeh v. Mansour, et.</u>
27         <u>al.</u>, Case No. BC 191035 in the Los Angeles County Superior
28         Court. (¶17). The complaint alleged causes of action for,

among other things, fraud and breach of fiduciary duty
arising out of the defendants' operation of a foreign
currency trading business. (¶17).

5. There was a lawsuit filed in the Los Angeles County Superior
Court on or about October 9, 2001, to recover $16 million
from the Leichners, Midland Euro, Inc. (MEI), and Midland
Euro Exchange, Inc. (MEEI) for breach of contract,
conversion, and fraud. (¶18). The lawsuit was entitled <u>Al
Baraka Intl. Investment Co., Ltd. v. Midland Euro Exchange,
Inc., et al.</u>, L.A.S.C. No. BC 259482. (¶18). A preliminary
injunction against MEI and MEEI, restricting them from
transferring assets, was issued in November 2001. (¶22).

6. On or about October 31, 2001, the National Futures
Association ("NFA"), a self-regulatory organization of
which MEI was a member, suspended MEI's membership in NFA
"to protect MEI's customers." (¶19). A publicly available
declaration submitted by the NFA described false and/or
deceitful financial conduct committed by MEI and its
management. (¶19).

7. On or about November 19, 2001, the United States Commodity
Futures Trading Commission (the "CFTC") announced its
intention to suspend or restrict MEI's registration with
the CFTC as a futures merchant. (¶20).

The Trustee further contends that in May 2002, despite knowing or
consciously avoiding knowledge of these widespread legal and
regulatory actions against the Leichners and their companies (MEI,
MEEI, and MEET), SFC decided to open a trading account for MGI in
order to profit from the proposed $1 million deposit and subsequent

1   trading fees (¶26).  On May 22, 2002, the Debtor made a wire transfer
2   of $1 million from MEEI's Lloyds Bank account in London to SFC's HSBC
3   Bank USA account in New York. (¶27).  From New York, the deposit was
4   transferred by SFC to an unspecified bank account in England.

5       Thereafter, from approximately May 22, 2002 until shortly before
6   the May 8, 2003 involuntary bankruptcy filings, the Debtor conducted
7   currency trades in the SFC account. (¶29).  The exact nature of these
8   trades is not described in the complaint and is being disputed by the
9   parties.  At the hearing, SFC stated that it acted as a bona fide
10  middleman connecting third parties interested in taking opposite
11  sides in trading on currency fluctuations.  It took a small fee for
12  its services.  The Trustee disagreed, claiming that SFC took an
13  active position in at least some of the trades, and effectively
14  engineered a casino-like trading system where the only party that
15  could potentially profit from the trades was SFC.  I need not resolve
16  this dispute because, regardless of how the trading operated, the
17  parties agree that SFC transferred $897,000 from MGI's initial $1
18  million deposit and whether it was to cover SFC's fees and
19  commissions (according to SFC) or profits (according to the Trustee)
20  (¶29) is not relevant to this motion.

21
22                      **B. The Trustee's Claims**

23      The Trustee is seeking to set aside and recover the allegedly
24  fraudulent transfers of at least $897,000 under two provisions of the
25  U.S. Bankruptcy Code - 11 U.S.C. §548 and §550 - which provide in
26  relevant part:

27          The trustee may avoid any transfer of an interest of the
            debtor in property, or any obligation incurred by the
28          debtor, that was made or incurred on or within one year
            before the date of the filing of the petition, if the debtor

1　　voluntarily or involuntarily made such transfer or incurred
　　　such obligation with actual intent to hinder, delay, or
2　　defraud any entity to which the debtor was or became, on or
　　　after the date that such transfer was made or such
3　　obligation was incurred, indebted.  §548(a)(1)(A).

4

And,
5
　　　The trustee may recover, for the benefit of the estate, the
6　　property transferred, or, if the court so orders, the value
　　　of such property, from:
7　　(1) the initial transferee of such transfer or the entity
　　　for whose benefit such transfer was made; or
8　　(2) any immediate or mediate transferee of such initial
　　　transferee.  §550(a).
9

10　　　　　　　　　　　**C. SFC's Motion to Dismiss**

11　　　　SFC's motion to dismiss and its reply to the Trustee's

12　　opposition, filed on June 12 and July 12, 2006, correspondingly,

13　　argue that the complaint should be dismissed on three

14　　independent grounds.

15　　　　First, SFC asserts that the complaint fails to state a

16　　claim because it is missing specific facts to show that SFC

17　　acted in bad faith in accepting the transfer from the Debtor.

18　　SFC contends that bad faith of the transferee is an affirmative

19　　element of the Trustee's *prima facie* case.

20　　　　Second, SFC argues that Congress did not intend to apply

21　　the fraudulent transfer provisions of §548 extraterritorially.

22　　According to SFC, the conduct in question occurred outside the

23　　territorial borders of the United States and absent a clear

24　　indication of congressional intent to the contrary, a

25　　presumption against extraterritoriality bars application of the

26　　statute to foreign entities and transactions.

27　　　　Finally, SFC contends that the doctrine of international

28　　comity should lead the Court to abstain from exercising its

1  jurisdiction in this matter.  According to the declaration
2  submitted by SFC, the U.S. and English laws conflict.  Under
3  English law, fraudulent intent on the part of the transferee
4  must be shown. Under U.S. law, the transferee can be liable
5  without a showing of actual fraudulent intent.  Given that the
6  laws conflict, that the "center of gravity" of the transaction
7  was in England, and that England has an interest in having its
8  own laws applied to transactions on its territory, SFC is asking
9  the Court to abstain from exercising the jurisdiction it
10  otherwise has.  I will consider the merits of each of these
11  arguments in turn.
12
13                          **IV. DISCUSSION**
14                      **A. Failure to State a Claim**
15      SFC's first argument for dismissal is that while the
16  Trustee has pleaded a Ponzi scheme, he also needs to plead
17  enough facts to prove that SFC did not act in good faith in
18  receiving the transfers. (SFC Motion, p. 14-15).  SFC cites <u>In</u>
19  <u>re Agricultural Research Technology Group, Inc.</u>, 916 F.2d 528,
20  535 (9th Cir. 1990), in support of the proposition that in order
21  for the Trustee to recover, "the defendant must have knowledge
22  or actual notice of circumstances sufficient to put the
23  transferee upon inquiry as to whether the debtor intended to
24  delay or defraud its creditors." (SFC Motion, p. 15).
25      SFC's interpretation of what needs to be proven to state a
26  fraudulent transfer claim is inaccurate and the quote above is
27  taken out of context.  <u>In re Agricultural Research</u> stands for
28  the proposition that the defendant's knowledge of the debtor's

1  intent to defraud creditors might be sufficient to prove that
2  the defendant acted in bad faith; it does not imply that lack of
3  good faith is part of the *prima facie* showing the Trustee needs
4  to make in order to prove his case.  Indeed, the opposite is
5  true, as many courts have acknowledged: good faith is an
6  affirmative defense available to SFC.  <u>See</u> Collier on Bankruptcy
7  ¶548.10 (15th Ed. rev. 2006) (stating that section 548 is based
8  on the Uniform Fraudulent Conveyance Act); <u>In re Cohen</u>, 199 B.R.
9  709, 719 (B.A.P. 9th Cir. 1996) ("The issue of good faith under
10 UFTA §8(a) is a defensive matter as to which the defendants
11 asserting the existence of good faith have the burden of
12 proof"); <u>In re Candor Diamond Corp.</u>, 76 B.R. 342, 349 n.4
13 (Bankr. S.D.N.Y. 1987) (holding that transferee's intent is only
14 relevant for the purposes of a good faith defense and is not
15 part of the trustee's *prima facie* case to recover fraudulent
16 transfers pursuant to 11 U.S.C. §548).  Therefore, under
17 §548(a)(1)(A), the essential elements of the *prima facie*
18 fraudulent transfer case are that within less than one year
19 prior to the bankruptcy filing, the Debtor made a transfer of
20 its property to SFC with actual intent to hinder, delay, or
21 defraud the debtor's creditors.

22     SFC agrees that the Trustee properly pleaded that the
23 Debtor was engaged in running a Ponzi scheme. (SFC Motion, p.
24 14). The mere existence of the Ponzi scheme is sufficient to
25 prove the Debtor's actual intent to hinder, delay, or defraud
26 its creditors. <u>See</u> <u>In re Agricultural Research</u>, 916 F.2d at 535
27 (citing <u>Conroy v. Schott</u>, 363 F.2d 90, 92 (6th Cir. 1966); <u>In re</u>
28 <u>Indep. Clearing House Co.</u>, 77 B.R. 843, 860 (D. Utah 1987)); <u>In</u>

1  re Old Naples Securities, Inc., 343 B.R. 310, 319 (Bankr. M.D.
2  Fla. 2006) ("Proof of a Ponzi scheme by itself establishes
3  actual intent to hinder, delay, or defraud creditors."). Per
4  the complaint, Midland Entities filed for bankruptcy on May 8,
5  2003 and the alleged transfers occurred between May 22, 2002 and
6  May 8, 2003, within one year of the filing. Therefore, the
7  Trustee properly pleaded a *prima facie* case of fraudulent
8  transfers under 11 U.S.C. §548.

10              **B. Presumption Against Extraterritoriality**

11      SFC's second argument is that failure to dismiss the
12  Trustee's complaint would result in extraterritorial application
13  of §548, which is contrary to congressional intent as expressed
14  by the plain language of the statute. It is a long-settled
15  principle of American law "that legislation of Congress, unless
16  a contrary intent appears, is meant to apply only within the
17  territorial jurisdiction of the United States." See In re
18  Maxwell Commc'n Corp., 170 B.R. 800, 809 (S.D.N.Y. 1994) (citing
19  Equal Employment Opportunity Comm'n v. Arabian Am. Oil Co., 499
20  U.S. 244, 248 (1991)).

21      The parties agree that allowing the Trustee to proceed with
22  his claims would result in extraterritorial application of §548.
23  The transferor was a Barbados corporation, the transferee was an
24  English corporation, the funds originated from a bank account in
25  London and, although transferred through a bank account in New
26  York, eventually ended up in another bank account in England.

27      Whether Congress intended to extend the reach of the
28  fraudulent transfer statute extraterritorially is a matter of

1 | great practical concern for the parties.   If the
2 | extraterritorial application of §548 is upheld, the Trustee
3 | would be able to recover from SFC by merely proving the
4 | existence of a Ponzi scheme and the fact that the transfers
5 | actually occurred.   Otherwise, the Trustee will not only face
6 | the logistical difficulties of bringing the suit in England, but
7 | he will also have to prove, under British law, that SFC had
8 | actual knowledge of the Midland Entities' scheme to defraud its
9 | creditors.

11 | **C. Exception to the Presumption Against Extraterritoriality**
12 | Prior to analyzing the presumption against extraterritorial
13 | application of the statute, I must address the Trustee's
14 | contention that the presumption does not apply here because the
15 | "regulated conduct" was "intended to, and resulted in,
16 | substantial effects within the United States." See <u>In re Simon</u>,
17 | 153 F.3d 991, 995 (9th Cir. 1998) (citing <u>Laker Airways, Ltd. v.</u>
18 | <u>Sabena Belgian World Airlines</u>, 731 F.2d 909, 925 (D.C. Cir.
19 | 1984)). The Trustee argues that this exception applies because
20 | SFC knew or reasonably should have known that the allegedly
21 | fraudulent transfer was part of a larger criminal scheme
22 | concocted by the Leichners for the sole purpose of defrauding
23 | American creditors, hiding stolen assets, and avoiding the reach
24 | of U.S. regulators.   According to the Trustee, if proven, such
25 | knowledge is strongly corroborative of SFC's intent to interfere
26 | with U.S. regulatory authorities and falls within the exception
27 | to the presumption against extraterritoriality.
28 | The Trustee's reading of the exception is misguided.

12

1  Keeping in mind that this is a Rule 12(b)(6) motion to dismiss,
2  the question the Court must address is whether the facts pleaded
3  in the complaint, taken as true and construed in the light most
4  favorable to the Trustee, are sufficient to establish that
5  "regulated conduct" was "intended to, and resulted in,
6  substantial effects within the United States."  The focus of the
7  exception is on the conduct itself - the allegedly fraudulent
8  transfer - and not on the knowledge and intent of the transferee
9  in accepting the funds.  Second, the exception only applies to
10 "regulated conduct," a concept that neither party has addressed.

11 Black's Law Dictionary defines "regulation" as "1. The act
12 or process of controlling by rule or restriction <the federal
13 regulation of the airline industry>... 3. A rule or order,
14 having legal force, usu. issued by an administrative agency
15 <Treasury regulations explain and interpret the Internal Revenue
16 Code>."  From that, it can be inferred that "regulated conduct"
17 is the "act or process" controlled by either judicial or
18 administrative rule or restriction.  Previous applications of
19 the exception reflect this interpretation.  In <u>Laker Airways</u>,
20 foreign airlines engaged in anti-competitive behavior that was
21 heavily regulated by the U.S. antitrust statutes.  In <u>In re
22 Simon</u>, a foreign creditor attempted to pursue collection abroad
23 of a debt discharged in a domestic bankruptcy in violation of
24 the injunction issued by the court.

25 These decisions are clearly distinguishable from the facts
26 of the Trustee's case.  The transfers to SFC occurred prior to
27 the filing of the bankruptcy petition, and, with a single
28 exception discussed below, were not subject to any rulings or

1  regulations of the U.S. courts or administrative agencies. Thus
2  the conduct was not "regulated," and the exception does not
3  apply.

4      The only fact pleaded in the complaint that could trigger
5  this exception is the injunction issued by the Los Angeles
6  County Superior Court in November 2001 against one of the
7  Leichners' companies - MEEI - restricting it from transferring
8  assets.  SFC allegedly disregarded the injunction by accepting a
9  $1 million transfer from MEEI's bank account in London.
10 Transfer in violation of the injunction constitutes "regulated
11 conduct."  However, the question this Court must address is
12 whether the violation qualifies as a "substantial" effect.  See
13 Consolidated Gold Fields Plc. v. Minorco, S.A., 871 F.2d 252,
14 262 (2nd Cir. 1989) ("In determining whether certain effects
15 qualify as 'substantial,' courts have been reluctant to apply
16 our laws to transactions that have only remote and indirect
17 effects in the United States"). While none of the cases the
18 Court had an opportunity to review discusses what qualifies as a
19 "substantial" effect, the facts here certainly do not add up to
20 one.

21     Some general guidelines the Courts have considered in
22 measuring "substantiality" are the number of people impacted by
23 the defendant's conduct, the dollar amount of damages caused,
24 and the scale of disruption in U.S. commercial activity.  In
25 Laker Airways, for instance, several foreign airlines conspired
26 to engage in anti-competitive behavior that drove a discount
27 U.S. airline - Laker Airways - out of business.  At the time,
28 Laker was carrying one out of every seven scheduled air

1 | passengers between the United States and England.  The anti-
2 | competitive behavior affected hundreds of Laker's employees and
3 | thousands of passengers. Laker suffered multi-million-dollar
4 | damages and the U.S. public was forced to pay higher prices for
5 | transatlantic travel. In _Laker Airways_, the Court found it
6 | "beyond dispute" that antitrust laws governed foreign airlines'
7 | behavior because they intended to, and their actions resulted
8 | in, substantial effects within the United States. _Laker Airways_,
9 | 731 F.2d at 925.  In SFC's case, on the other hand, the effects
10 | of the alleged injunction violation are not "substantial."
11 | There is only the plaintiff in the injunction suit who was
12 | injured by SFC's conduct, the damages are comparatively
13 | insignificant, and the impact on the U.S. commerce in general is
14 | _de minimis_. The Trustee did not meet his burden of proof and the
15 | exception to the presumption against extraterritoriality does
16 | not apply.

17 |

18 | ### D. **Extraterritorial Application of 11 U.S.C. §548**

19 |      Next, the Court needs to address whether Congress intended
20 | universal extraterritorial application of the fraudulent
21 | transfer provisions codified in §548.  This is an issue of first
22 | impression in the Ninth Circuit, with a split of opinion in the
23 | other circuits and a petition for writ of certiorari pending
24 | with the Supreme Court, asking, _inter alia_, to clarify
25 | congressional intent on this issue.  Most recently, the Fourth
26 | Circuit upheld extraterritorial application of §548.  See _In re_
27 | _French_, 440 F.3d 145 (4th Cir. 2006), _cert_. _petition pending_, __
28 | U.S. __ (filed May 15, 2006).  A bankruptcy court in the Second

Circuit, however, dealing with the Trustee's avoidance power
under the similar preferential transfer statute - 11 U.S.C. §547
- held that the lack of clearly expressed congressional intent
prevents its extraterritorial application.  See In re Maxwell
Comm'n. Corp., 170 B.R. 800, 814 (Bankr. S.D.N.Y. 1994), aff'd
on other grounds, In re Maxwell, 93 F.3d 1036 (2nd Cir. 1996).

The starting point in statutory construction is the
language of the statute itself. Nothing in the text of §548
indicates congressional intent to apply it extraterritorially.

Next, the Court looks at other sections of the Bankruptcy
Code to see if they shed light on congressional intent. See
United Savings Ass'n v. Timbers of Inwood Forest Associates, 484
U.S. 365, 371 (1988) ("A provision that may seem ambiguous in
isolation is often clarified by the remainder of the statutory
scheme - because the same terminology is used elsewhere in a
context that makes its meaning clear, or because only one of the
permissible meanings produces a substantive effect that is
compatible with the rest of the law.").

It was suggested that §548 read in conjunction with §541 of
the Code demonstrates congressional intent to apply §548
extraterritorially.  Section 541 provides that "property of the
estate" includes property "wherever located and by whomever
held."  There is a split among circuits on whether "property of
the estate" includes property that could be, but has not yet
been, recovered as the object of a fraudulent transfer. See In
re French, 440 F.3d at 151-2, n.2.  The majority of the courts
have concluded that property held by third-party transferees
only becomes "property of the estate" after the transfer has

1  been avoided. See id. (citing In re Saunders, 101 B.R. 303, 304-
2  05 (Bankr. N.D. Fla. 1989); FDIC v. Hirsch (In re Colonial
3  Realty Co.), 980 F.2d 125, 131 (2d Cir. 1992); Dunes Hotel
4  Assocs. v. Hyatt Corp., 235 B.R. 492, 504-05 (D.S.C. 2000)); but
5  see id. (citing Cullen Ctr. Bank & Trust v. Hensley (In re
6  Criswell), 102 F.3d 1411, 1417 (5th Cir. 1997); Am. Natl. Bank
7  v. MortgageAmerica Corp. (In re MortgageAmerica Corp.), 714 F.2d
8  1266, 1275 (5th Cir. 1983)).

9      I need not address the intricacies of this dispute.
10 Suffice it to say that the Fifth Circuit's approach in Criswell
11 to what constitutes "property of the estate" is susceptible to
12 criticisms well articulated in other courts' decisions.  I find
13 the reasoning of the majority more logical and defensible.
14 Thus, I hold that allegedly fraudulent transfers do not become
15 property of the estate until they are avoided.

16     Since neither the plain language of the statute nor its
17 reading in conjunction with other parts of the Code establish
18 congressional intent to apply §548 extraterritorially, I now
19 turn to other considerations.

20

21                          **E. Policy**

22     In interpreting the statute, the Court must first draw a
23 line between advancing the policy goals of the bankruptcy system
24 and interpreting indicia of congressional intent.  It is
25 undeniable that policy considerations favor extraterritorial
26 application of 11 U.S.C. §548.  The efficacy of the bankruptcy
27 proceeding depends on the court's ability to control and marshal
28 the assets of the debtor *wherever located*. In re Simon, 153 F.3d

1  at 996 (quoting <u>In re Rimsat</u>, 98 F.3d 956, 961 (7th Cir. 1996))

2  (emphasis added).  Failure to extend application of §548 to

3  transfers outside the territorial borders of the United States

4  creates a loophole for unscrupulous debtors to freely transfer

5  their assets to shell entities abroad and avoid the reach of the

6  Bankruptcy Code.  <u>See, generally</u>, David M. Green and Walter

7  Benzija, *Spanning the Globe: The Intended Extraterritorial Reach*

8  *of the Bankruptcy Code*, 10 Am. Bankr. Inst. L. Rev. 85, 86-7

9  (2002) (advocating extraterritorial application of the U.S.

10  Bankruptcy Code on policy grounds).

11      These policy considerations, however, must be balanced

12  against the presumption against extraterritoriality, which

13  serves to protect against unintended clashes between our laws

14  and those of other nations which could result in international

15  discord. <u>See E.E.O.C. v. Arabian American Oil Co.</u>, 499 U.S. 244,

16  248 (1991).  The Ninth Circuit has held that policy

17  considerations alone are insufficient to overcome the

18  presumption against extraterritoriality.  <u>See Subafilms, Ltd. v.</u>

19  <u>MGM-Pathe Communications Co.</u>, 24 F.3d 1088, 1096 (9th Cir. 1994)

20  (en banc) ("...the ultimate touchstone of extraterritoriality

21  consist[s] of an ascertainment of congressional intent; courts

22  [do] not rest solely on the consequences of a failure to give a

23  statutory scheme extraterritorial application.").

24

25          **F. Fourth Circuit's Recent Decision**

26      Prior to the Fourth Circuit's decision in <u>In re French</u>, no

27  court had ever held that Congress intended extraterritorial

28  application of §548.  The Trustee advocates the adoption of the

18

1 | holding in <u>In re French</u> by this Court.  The problem with the
2 | conclusion reached by the Fourth Circuit is that it requires the
3 | Court to make a logical leap that I am not prepared to make.

4 |     The analysis in <u>In re French</u> starts with two correct
5 | premises: (1) §541(a)(1) defines "property of the estate" as,
6 | *inter alia*, all "legal or equitable interests of the debtor in
7 | property as of the commencement of the case" and (2) §548 allows
8 | the avoidance of certain transfers of such "interest[s] of the
9 | debtor in property."  Based on this, the Fourth Circuit reaches
10 | the following conclusion: "By incorporating the language of §541
11 | to define what property a trustee may recover under his
12 | avoidance powers, §548 plainly allows a trustee to avoid any
13 | transfer of property that *would have been* 'property of the
14 | estate' prior to the transfer in question - as defined by §541 -
15 | even if that property is not 'property of the estate' now." <u>See</u>
16 | <u>In re French</u>, 440 F.3d at 151. (emphasis in the original).

17 |     This reasoning apparently presumes that the debtor retains
18 | a "legal or equitable" interest in the property transferred pre-
19 | petition, or to paraphrase, that "property of the estate"
20 | includes property transferred but not yet recovered.  It ignores
21 | the language in §541(a)(1) and (a)(3) that the debtor must have
22 | an interest in the property "as of the commencement of the case"
23 | and that property of the estate includes "any interest in
24 | property that the trustee *recovers* under section... 550 ... of
25 | this title." (emphasis added).  When the plain meaning of the
26 | language of the statute is clear, the courts need only enforce
27 | it.  This statute seems very clear to any ordinary reader:
28 | property that has been fraudulently transferred only becomes

1 property of the estate when the transfer has been set aside.

2    Even if these provisions do not meet the plain meaning
3 test, to read them as was done by the Fifth Circuit in <u>In re</u>
4 <u>Criswell</u>, 102 F.3d 1411, 1416 (5th Cir. 1997) (cited by the
5 Fourth Circuit in support of its decision in <u>In re French</u>), is
6 to violate a maxim of statutory interpretation that holds that
7 the court should attempt to give meaning and effect to every
8 word, clause and section of a statute.  See <u>Chickasaw Nation v.</u>
9 <u>U.S.</u>, 534 U.S. 84, 93 (2001) (citing <u>U.S. v. Menasche</u>, 348 U.S.
10 528, 538-39 (1955)).  While the maxims of statutory
11 interpretation are not mandatory rules, in the case of
12 §541(a)(1) and (a)(3), they do help to clarify what Congress
13 intended.

14    <u>In re French</u> totally ignores §541(a)(3) and uses an unclear
15 and convoluted method to reach its conclusion.  I have a great
16 deal of trouble following the Fourth Circuit's reasoning and am
17 not persuaded that it leads to the proper conclusion.  Thus I
18 find no basis for holding that Congress intended the trustee's
19 avoiding powers to apply extraterritorially.

20    Perhaps the true reason the Fourth Circuit extended
21 application of §548 extraterritorially lies in the next
22 paragraph, which acknowledges that such "interpretation fully
23 accords with the purposes of the Bankruptcy Code's avoidance
24 provisions, which is to prevent debtors from illegitimately
25 disposing of property that should be available to their
26 creditors."  See <u>In re French</u>, 440 F.3d at 152. However, as
27 noted above, the Ninth Circuit does not view policy
28 considerations alone as valid grounds for overcoming the

1   presumption against extraterritoriality.  See Subafilms, 24 F.3d
2   at 1096 ("...the ultimate touchstone of extraterritoriality
3   consist[s] of an ascertainment of congressional intent; courts
4   [do] not rest solely on the consequences of a failure to give a
5   statutory scheme extraterritorial application.").  Therefore,
6   since I can find no evidence of congressional intent to extend
7   the application of §548 extraterritorially, the Trustee may not
8   pursue his claims against SFC under this statute.

9
10                      **G. International Comity**

11      SFC's third argument for dismissal is based on the doctrine
12   of international comity.  Under this doctrine, courts sometimes
13   defer to the laws or interests of a foreign country and decline
14   to exercise the jurisdiction they otherwise have. See Mullica v.
15   Occidental Petroleum Corp., 381 F. Supp. 2d 1134, 1155 (C.D.
16   Cal. 2005). "In the legal sense, comity: is neither a matter of
17   absolute obligation, on the one hand, nor of mere courtesy and
18   good will, on the other." In re Simon, 153 F.3d at 998. "But it
19   is a recognition which one nation allows within its territory to
20   the legislative, executive or judicial acts of another nation,
21   having due regard both to international duty and convenience and
22   to the rights of its own citizens or of other persons who are
23   under the protection of its laws." Id.

24      SFC urges the Court to dismiss the Trustee's complaint
25   because U.S. and English fraudulent transfer laws lead to
26   conflicting outcomes; because the "center of gravity" of the
27   transaction is in England; and because England has greater
28   interest in adjudicating this dispute.  Given the Court's

holding that §548 does not apply extraterritorially, I need not reach the substance of this argument.

## V. CONCLUSION

The Trustee's complaint to avoid and recover fraudulent transfers in the amount of at least $897,000 is hereby dismissed without leave to amend pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, as made applicable in bankruptcy by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.  The Trustee properly pleaded a *prima facie* case under 11 U.S.C. §548.  However, I can not find any evidence that would elucidate congressional intent to broadly extend application of the fraudulent transfer provisions of the Bankruptcy Code outside the territorial borders of the United States.  Absent such indicia of congressional intent, the presumption against extraterritoriality bars application of the statute to a foreign transfer.

The Court recognizes that its decision does nothing to close the loophole in the Bankruptcy Code that allows dishonest debtors to avoid the reach of the U.S. bankruptcy system by hiding the assets abroad.  At the same time, Congress is the ultimate arbiter of the laws it enacts and it has the power to alter the language of the statute to clearly manifest its intent.  This is particularly so given that Congress recognizes the need to verbalize its intent in order to overcome the presumption against extraterritoriality.  In 1952 Congress amended section 541 of the Code to define property of the estate as all property "wherever located." <u>See</u> <u>In re French</u>, 440 F.3d

at 151. In passing the amendment, Congress explained that the
amendment "make[s] clear that a trustee in bankruptcy is vested
with the title of the bankrupt in property which is located
without, as well as within, the United States." See id. (quoting
H.R. Rep. No. 82-2320, at 15 (1952), reprinted in 1952
U.S.C.C.A.N. 1960, 1976).  In light of such a clearly-worded
amendment to another section of the Bankruptcy Code and the
exception in §541(a)(3) to property which has not yet been
recovered under the trustee's strong-arm powers, the only
logical interpretation of congressional silence with respect to
11 U.S.C. §548 is that the presumption against
extraterritoriality must stand.

DATED: 8/15/06

GERALDINE MUND
United States Bankruptcy Judge

1

## CERTIFICATE OF MAILING

2

I, _____ PHILIP HARRAWAY _____, a
regularly appointed and qualified clerk of the United States Bankruptcy Court

3  for the Central District of California, do hereby certify that in the
performance of my duties as such clerk, I personally mailed to each of the

4  parties listed below, at the addresses set opposite their respective names, a
copy of the

5

## MEMORANDUM OF OPINION RE MOTION TO DISMISS

6  ## PURSUANT TO F.R.C.P. 12(b)(6)

7  in the within matter.  That said
envelope containing said copy was deposited by me in a regular United States

8  mailbox in the City of Los Angeles, in said District, on ____8/16/06____

9

10  Chapter 7 Trustee
Christopher Barclay, Trustee

11  LECG, LLC
600 Anton Boulevard, Suite 1350

12  Costa Mesa, CA 92626

13  Leonard I. Gumport
Aleksandra Zimonjic

14  Gumport | Reitman
550 South Hope Street, Suite 825

15  Los Angeles, CA 90071

16  Attorneys for Christopher Barclay, Chapter 7 Trustee

17  Howard Steinberg
Irell & Manella LLP

18  1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276

19

20  U.S. Trustee - Interoffice Mail
c/o Jennifer Braun

21

22

23  _____

24  (Clerk)

25

26

27

28